UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COLLEEN DOWNEY and PATRICIA DOWNEY, <br><br>Plaintiffs, <br><br>v. <br><br>WELLS FARGO BANK, N.A., <br><br>Defendant. | Civil Action No. 12-11340-DJC |

# MEMORANDUM AND ORDER

**CASPER, J.**                                                                                                   **July 11, 2014**

## I.     Introduction

Colleen Downey and Patricia Downey ("Plaintiffs") have filed this lawsuit against Defendant Wells Fargo Bank, N.A. ("Wells Fargo") alleging violations of the Massachusetts Consumer Credit Cost Disclosure Act ("MCCCDA"), Mass. Gen. L. c. 140D; Mass. Gen. L. c. 93 § 49; Mass Gen. L. c. 93A; fraudulent misrepresentation; and intentional and/or negligent infliction of emotional distress. D. 1-1. Wells Fargo has now moved for summary judgment. D. 16. For the reasons stated below, the Court ALLOWS Defendants' motion.

## II.    Factual Allegations

Unless otherwise noted, the following facts are as described in Wells Fargo's Statement of Facts, D. 18 ("SOF"), which Plaintiffs have admitted by their failure to controvert these facts. Stonkus v. City of Brockton Sch. Dep't, 322 F.3d 97, 102 (1st Cir. 2003) (quoting D. Mass. L.R. 56.1) (providing that "[m]aterial facts of record set forth in the statement required to be served

by the moving party will be deemed for purposes of the motion to be admitted by the opposing parties unless controverted by the statement required to be served by opposing parties").[1]

In 2009, Plaintiffs engaged Wells Fargo to refinance the mortgage on their property. SOF ¶¶ 1-2. Wells Fargo is a federally chartered national bank. Id. ¶ 45. Plaintiffs allege that a Wells Fargo representative told Colleen Downey ("C. Downey") that Plaintiffs' loan payment would be $1,800 including escrow and taxes but cannot recall the name of the representative who told her that. Id. ¶¶ 3-4. On September 17, 2009, Wells Fargo sent C. Downey initial disclosures for her loan, which included a "Truth-in-Lending disclosure." Id. ¶¶ 5, 7. The Truth-in-Lending disclosure stated that Plaintiffs' initial payments would be between $1,784.12 and $1,769.11 with an annual percentage rate of 3.3636%. Id. ¶¶ 8-9. The disclosure also stated that Plaintiffs' finance charge would be $182,227.29 and their total amount financed would be $333,553.22. Id. ¶ 9.

Wells Fargo also sent Plaintiffs a "Good Faith Estimate of Settlement Cost" on September 17, 2009, which clarified the loan terms, costs and payments providing for monthly principal and interest payments of $1,631.08, a property insurance premium of $89.50, annual property taxes of $395.47, a mortgage insurance premium of $153.04 and therefore a total monthly payment of $2,269.09. Id. ¶ 10. These amounts reflected a total mortgaged amount of $341,649.00 with a 4.0% initial interest rate. Id.

On September 28, 2009, Plaintiffs completed and signed a mortgage loan application in the amount of $341,649.00 with a 4.0% initial interest rate. Id. ¶ 13. Wells Fargo approved Plaintiffs for a loan of $348,957.00. Id. ¶ 14. The parties closed the loan on November 10, 2009

---

[1] At oral argument, counsel for Downey asserted that he followed L.R. 56.1 by providing the Court with a list of facts "as to which it is contended that there exists a genuine issue to be tried." L.R. 56.1. The local rule also requires, however, the nonmoving party to respond to the moving party's statement of material facts or they will be deemed admitted as noted above.

and the Plaintiffs signed the Uniform Residential Home Loan Application on that date, id. ¶¶ 15, 16, although Plaintiffs separately assert that these signatures were forged. D. 21 ¶ 4. Although the amount of the loan changed, the initial interest rate and all other terms were the same as the September 28, 2009 application. SOF ¶ 17.

At the closing, Colleen Downey signed the loan documents under the closing attorney's supervision. Id. ¶ 18. She was asked to sign documents before her mother arrived. D. 21 ¶ 8. Although no one prevented her from reading the documents, she did not read or ask any questions about the documents before signing them. D. 18 ¶¶ 19-21. Ultimately, Plaintiffs signed a promissory note in the amount of $348,957.00 secured by a mortgage on their property. Id. ¶¶ 27-28. At the closing, Plaintiffs received a "TILA" or "truth-in-lending" disclosure which they signed, a "HUD-1 Settlement Statement" and a "Loan Profile." Id. ¶¶ 29-30. The TILA Disclosure stated that their initial payment would vary from $1,822.28 to $1,806.95 with a total finance charge of $188,240.56 and total amount financed of $340,822.52. Id. ¶¶ 31-32. The HUD-1 Settlement Statement noted that Plaintiffs would also have to pay flood insurance, property taxes and property insurance on a monthly basis. SOF ¶ 34. Plaintiffs also received and signed two copies of the notice of their right to cancel the loan. Id. ¶ 35.

Plaintiffs defaulted on their mortgage in May 2011. Id. ¶ 42. Plaintiffs did not object to their payment amount until they sent Wells Fargo a demand letter on February 8, 2012. Id. ¶¶ 36-37. The letter demanded damages for Wells Fargo's failure to make certain disclosures at the closing and asked Wells Fargo to reallocate Plaintiffs' loan payments, but did not reference any debt collection activity or payment applications by Wells Fargo. Id. ¶¶ 38-39.

**III.    Procedural History**

Plaintiffs filed a case in Norfolk Superior Court on June 3, 2012. D. 1-1 at 5.[2] Wells Fargo removed this matter to this Court on July 23, 2012. D. 1. Counts I and II allege violations of Mass. Gen. L. c. 93A and c. 140D, respectively and assert in part that Wells Fargo made inaccurate or insufficient disclosures about nature of the loan at closing (the "disclosure claims"). Compl., D. 1-1 at 9-10. Plaintiffs' also assert through their c. 93A claim that Wells Fargo, in the negotiations preceding the loan closing, intentionally misrepresented that Plaintiffs could refinance their loan in such a way to have a total monthly payment of $1,800 per month, while Count III alleges a fraudulent misrepresentation claim under asserting same (the "fraud claims"). Id. at 9-11. Count IV alleges a violation of Mass. Gen. L. c. 93, § 49. Id. at 12. Count V alleges negligent and/or intentional infliction of emotional distress. Id.

## IV.  Discussion

### A.  Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial. Borges ex rel. S.M.B.W. v. Serrano–Isern, 605

---

[2] The complaint initially named Harmon Law Offices, P.C. as a co-defendant, but this entity was dismissed from the action on June 28, 2012. D. 1-1 at 56.

F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

### B. The Disclosure Claims Fail as a Matter of Law

#### *1. Wells Fargo Complied with State and Federal Disclosure Requirements*

Although Wells Fargo argues that the MCCCDA does not apply to loans originated by a federal chartered institution, Wells Fargo posits that whether state or federal law applies to Plaintiffs' loan, they disclosed the clear and conspicuous terms of the loan at closing as required by both statutes. D. 17 at 5. To the extent that Plaintiffs argue that these terms did not comply with what they were told prior to the loan closing, she has not shown how such action amounts to the Defendant's failure to disclose, clearly and accurately, the material terms of the mortgage transaction, or, ultimately, how such actions amount to liability under the state and federal truth in lending statutes. Shaw v. BAC Home Loans Serv., LP, No. 10-11021-DJC, 2013 WL 789195, at *7 (D. Mass. Mar. 1, 2013) (dismissing TILA claim where plaintiff alleged that broker told her that her payments would be a certain amount different from those in the TILA disclosures, but she failed to state how such actions violated TILA); see also In re DiVittorio, 670 F.3d 273, 282 (1st Cir. 2012) (noting that MCCCDA was "closely modeled" after the TILA and, in most respects "mirrors its federal counterpart") (citation omitted).

To the extent that Plaintiffs argue that Wells Fargo made inaccurate disclosures regarding the loan at the time of closing, such conduct does fall within the ambit of the MCCCDA and TILA. In re Bettano, 440 B.R. 13, 15 (Bankr. D. Mass. 2010) (noting that if the documents provided "are inaccurate to a degree that exceeds the statutorily-established tolerance for error," then the borrower may rescind the loan rescission period extends until three days after a compliant disclosure form is eventually provided to the borrower," but not more than four years)

(citing McKenna v. First Horizon Home Loan Corp., 475 F.3d 418, 421 (1st Cir. 2007)) (explaining the extended right to rescind in federal TILA cases, and that the rescission process is the same under the MCCCDA). Here, Plaintiffs signed a promissory note in the amount of $348,957.00, SOF ¶ 27, but the "truth-in-lending" disclosure listed the total amount financed as being $340,822.52. Id. ¶ 32. Meanwhile, the interest rate on the promissory note was 4.000 percent, while the "truth-in-lending" disclosure listed the APR as 3.3936 percent. Id. ¶¶ 8; D. 18-4 at 2. Nevertheless, the "principal amount" on the note does not necessarily equal the "amount financed," and the "interest rate" on the note does not necessarily equal "APR;" rather, these are terms of art. For example, the "amount financed" is a number derived from the "principal amount." As the Fourth Circuit has explained:

> The perceived inconsistency arises, however, from the lender's compliance with the truth-in-lending requirements. "APR" and "amount financed" are terms of art, defined by federal regulations, and explained in the disclosure statement itself. "Amount financed" is derived by making certain adjustments to the principal loan amount, most notably the subtraction of any prepaid finance charge. See 12 C.F.R. § 226.18(b). There is therefore no inconsistency in the fact that this "amount financed" differs from the principal amount of the loan, and the difference is clearly explained in the disclosure. "APR" likewise differs from the general definition of interest rate because it considers, by definition, a broader range of finance charges when determining the total cost of credit as a yearly rate. See 15 U.S.C. §§ 1605-06.

Smith v. Anderson, 801 F.2d 661, 663 (4th Cir. 1986). The amount financed is calculated by: "(1) Determining the principal loan amount or the cash price (subtracting any down payment); (2) Adding any other amounts that are financed by the creditor and are not part of the finance charge; and (3) Subtracting any prepaid finance charge." 12 C.F.R. § 226.18(b). The APR, meanwhile, is calculated in relation to the finance charge, which includes service charges, loan fees, fees for a credit report and fees for insurance. Smith, 801 F.2d at 663; 15 U.S.C. § 1606(a). Against this backdrop, Downey has presented no evidence that Wells Fargo's disclosures with respect to the principal amount, amount financed, interest rate or APR were inaccurate. Instead,

6

she has only shown that they were inconsistent with each other, which is to be expected given the different methods by which each of these terms is calculated. Accordingly, in the absence of any evidence that Wells Fargo made inaccurate disclosures at the loan closing, Plaintiffs cannot prevail on their MCCCDA claim as a matter of law to the extent Plaintiffs assert that Wells Fargo made inaccurate disclosures.

Plaintiffs raise an alternate theory of MCCCDA liability in their opposition to the pending motion– that despite the MCCCDA's requirement that changes in the truth-in-lending disclosure must be provided to the borrower no later than three business days before the consummation of the loan, 209 C.M.R. § 32.19(1)(b)(2), Wells Fargo did not provide the borrower with written notice of these changes within three days of closing. D. 21 at 13. Although Plaintiffs acknowledge the existence of a writing apparently signed by C. Downey that acknowledges receipt of revised loan terms, Plaintiffs now argues that Wells Fargo forged her signature.[3] Id. at 4, 13. Plaintiffs, however, do not rely upon any evidence that supports this allegation of forgery, but point only to C. Downey's deposition testimony that the signature did not look like hers, but could be hers. D. 18-1 at 8; see D. 23 at 3; D. 18-5 at 15 (P. Downey's testimony identifying signature as daughter's signature). Accordingly, to the extent Plaintiffs assert that there is a genuine dispute of material fact precluding judgment as a matter of law on their MCCCDA claim, the Court disagrees.

        2.      *The National Bank Act Preempts the Disclosure Claims*

---

[3] At oral argument, counsel for Plaintiffs argued that because Plaintiffs' loan application was taken by telephone, D. 18-3 at 4, her signature on the application could not be authentic. Again, this does not create a genuine issue of material fact, where they offer no specific, admissible facts that the C. Downey's signature, which appears on this document, was forged.

7

Alternatively, Wells Fargo also argues that Plaintiffs' disclosure claims[4] must fail because they are preempted by the National Bank Act ("NBA"). D. 17 at 6. The NBA provides that a federally chartered bank shall have the power "[t]o exercise . . . all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24. "This grant[] of authority [is] not normally limited by, but rather ordinarily pre-empting, contrary state law." Barnett Bank of Marion Cnty., N.A. v. Nelson, 517 U.S. 25, 32 (1996) (citing Franklin Nat'l Bank of Franklin Square v. New York, 347 U.S. 373, 375-79 (1954) (recognizing that the NBA preempted a state law limiting a bank's power to advertise for deposits)); see also Cuomo v. Clearing House Ass'n, LLC, 557 U.S. 519, 534 (2009) (noting that the Supreme Court has "not invoked the presumption against pre-emption, and think[s] it unnecessary to do so in giving force to the plain terms of the National Bank Act"). "Thus, a state law may be preempted by the National Bank Act when it frustrates or limits the ability of a national bank to exercise its statutorily granted powers." SPGGC, LLC v. Ayotte, 488 F.3d 525, 531 (1st Cir. 2007) (citing Barnett Bank, 517 U.S. at 33-34). However, federally chartered banks remain "subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purpose of the NBA." Watters v. Wachovia Bank, N.A., 550 U.S. 1, 11 (2007). "Accordingly, to determine whether the National Bank Act preempts the enforcement of the [MCCCDA and c. 93A], [the Court] must first determine whether a national bank's enumerated and incidental powers include the issuance of [home loans]. If a national bank has these powers, we must then determine whether the [MCCCDA and c. 93A] limit the bank's ability to exercise that power." Ayotte, 488 F.3d at 531.

---

[4] Wells Fargo has not argued preemption as to the misrepresentation claims, as a number of courts have found that same are not preempted. See New Mexico v. Capital One Bank (USA), N.A., --- F. Supp. 2d ----, No. 13-00513, 2013 WL 5874318, at *14 (D.N.M. Oct. 29, 2013) (collecting cases).

8

The Court resolves the first question. There can be no real dispute that national banks have the power to issue real estate loans. The NBA provides that national banks may: "make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate." 12 U.S.C. § 371.

The second question presents more complicated inquiry. The NBA's implementing regulations, as drafted by the Office of the Comptroller of the Currency ("OCC"), provide that a "national bank may make real estate loans under 12 U.S.C. [§] 371 and § 34.3 without regard to state law limitations concerning . . . [d]isclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents." 12 C.F.R. § 34.4. Accordingly, the Court must examine exactly what the state statutes that Plaintiffs invoke seek to regulate.

The primary statute at issue relative to the disclosure claims is the MCCCDA. "The MCCCDA is a law regulating disclosures regarding credit." Sovereign Bank v. Sturgis, 863 F. Supp. 2d 75, 92 (D. Mass. 2012). Specifically, it regulates the disclosures lenders must make to borrowers regarding the material terms of consumer credit transactions. McKenna v. First Horizon Home Loan Corp., 475 F.3d 418, 421-22 (1st Cir. 2007) (discussing federal Truth-In-Lending Act ("TILA") but noting that MCCCDA "mirrors" TILA). Plaintiffs' principal argument as to the MCCCDA claim is that Wells Fargo failed to accurately disclose the material terms of their refinancing. A portion of Plaintiffs' c. 93A claim also asserts a similar theory of the case – that Wells Fargo "fail[ed] to provide the required notices to the plaintiffs." Compl. ¶ 26(a).

In Sturgis, the district court held that the Home Owners' Loan Act ("HOLA") preempted

the MCCCDA because HOLA's implementing regulations as drafted by the Office of Thrift Supervision ("OTS") "definitively preempted" the MCCCDA as the MCCCDA "purports to impose requirements regarding disclosures." Sturgis, 863 F. Supp. 2d at 92. The OTS regulation at issue in Sturgis is nearly identical to the OCC regulations applicable here. Whereas the OTS regulation states that "[t]he types of state laws preempted . . . include without limitation, state laws purporting to impose requirements regarding . . . [d]isclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents," 12 C.F.R. § 560.2(b), the OCC regulation states that a "national bank may make real estate loans under 12 U.S.C. [§] 371 and § 34.3 without regard to state law limitations concerning . . . [d]isclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents." 12 C.F.R. § 34.4(9). Although the OTS regulation explicitly invokes "preempt[ion]," the OCC regulation merely disclaims limitations promulgated under state law. In any event, the Sturgis court concluded that, based upon the OTS regulation, the HOLA preempted the MCCCDA.

Other courts have agreed with this preemption approach. One judge in this district's bankruptcy court recently decided that "any state statute which imposes disclosure requirements and protections for high-cost loans originated by federally chartered institutions is preempted by federal law." Thomas v. CitiMortgage, Inc. (In re Thomas), 476 B.R. 691, 697 (Bankr. D. Mass. 2012); see also In re Frykberg, 490 B.R. 652, 659 (B.A.P. 1st Cir. 2013) (holding that HOLA explicitly preempts MCCCDA).

Moreover, courts in other circuits have found that the NBA preempts similar state laws.

In <u>Gutierrez v. Wells Fargo Bank, N.A.</u>, 704 F.3d 712 (9th Cir. 2012), for example, a class of plaintiffs sued Wells Fargo, successfully demonstrating to the district court, *inter alia*, that Wells Fargo's failure to disclose the effects of its posting methods, which maximized overdrafts, and its misleading statements regarding same violated the California Unfair Competition Law ("UCL"), a statute that closely resembles c. 93A. <u>Id.</u> at 716-17. The Ninth Circuit reversed, finding that the NBA preempted the "fraudulent" prong of the UCL because "'[a] national bank may exercise its deposit-taking powers without regard to state law limitations concerning,' among other things, 'disclosure requirements.'" <u>Id.</u> at 726 (quoting 12 C.F.R. § 7.40007(b)(3)). District courts in other circuits have come to similar conclusions. See <u>New Mexico</u>, No. 13-00513, 2013 WL 5874318, at *13 (concluding that NBA preempted New Mexico Unfair Practices Act to the extent that state law claims were based upon alleged non-disclosures); <u>Wier v. Countrywide Bank, N.A.</u>, No. 10-CV-11468, 2011 WL 1256944, at *4 (E.D. Mich. Mar. 31, 2011) (concluding that the NBA preempted fraudulent misrepresentation claim based upon non-disclosures).

Here, Plaintiffs' disclosure claims assert that Wells Fargo violated provisions of Massachusetts law that "purport[] to impose requirements regarding disclosures." See <u>Sturgis</u>, 863 F. Supp. 2d at 92. Plaintiff asserts either that Wells Fargo failed to make the proper disclosures or made inaccurate disclosures regarding their mortgage. These claims go to the heart of the NBA's preemptive reach, as they address the disclosures that banks are required to make to mortgagors. 12 C.F.R. § 34.4(9). In addition, the Ninth Circuit found these types of claims preempted under similar circumstances. <u>Gutierrez</u>, 704 F.3d at 726. The Court finds this reasoning persuasive and concludes that the MCCCDA regulates, *inter alia*, "disclosure[s]" regarding mortgages by federally chartered institutions, <u>see</u> 12 C.F.R. § 34.4, and therefore is

preempted by the NBA.

Plaintiffs argue that TILA does not preempt state regulations that are substantially similar to it. D. 21 at 10. However, Wells Fargo does not argue that TILA preempts the MCCCDA. It is true that Plaintiffs could fairly argue that "the NBA . . . and federal banking regulations preempt only contrary state law." Kriegel v. Bank of Am., N.A., No. 07-12246-NG, 2010 WL 3169579, at *5 (D. Mass. Aug. 10, 2010) (emphasis in original). Indeed, "[e]xcept for a modest variance in regard to the limitation period . . . the MCCCDA mirrors its federal counterpart. This is not an accident; the Massachusetts legislature closely modeled the state law after the TILA." McKenna v. First Horizon Home Loan Corp., 475 F.3d 418, 422 (1st Cir. 2007) (citing Lynch v. Signal Fin. Co., 367 Mass. 503, 505 (1975)). Nevertheless, there is, as the First Circuit noted, a difference between federal and state regulation as to loan disclosures – the statute of limitations. This difference is not to be taken lightly as "there are also long-standing important policy considerations underlying enforcement of statutes of limitations." Swasey v. Barron, 46 Mass. App. Ct. 127, 132 (1999) (citing Wood v. Carpenter, 101 U.S. 135, 139 (1879)); see also Museum of Fine Arts, Boston v. Seger-Thomschitz, 623 F.3d 1, 14 (1st Cir. 2010) (noting that "statutes of limitations cannot be fairly characterized as technicalities, and they serve important interests"). Accordingly, the similarities between TILA and the MCCCDA do not save the MCCCDA from the NBA's preemptive reach.[5]

> 3. *The Disclosure Claims Are Time-Barred to the Extent Plaintiffs Assert Them Under TILA*

Wells Fargo points out that the NBA's preemptive reach does not necessarily mean that

---

[5] Plaintiffs cite Varela v. E*Trade Bank, No. 10-10186-MLW, 2010 WL 8228829 (D. Mass. Oct. 22, 2010), report and recommendation adopted as modified, No. 10-10186-MLW, 2011 WL 6757434 (D. Mass. Dec. 23, 2011) for the proposition that the NBA does not preempt the MCCCDA. However, Varela addressed TILA's potential preemption of the MCCCDA and not the NBA's preemption of same. Id. at *4.

Plaintiffs would have no statutory vehicle to entitle them to the relief that they seek, pointing to TILA. D. 17 at 9. Even if Plaintiffs had pled a TILA claim, TILA claims must be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). Here, Plaintiffs have alleged violations that occurred at the date of the closing, which occurred on November 10, 2009. SOF ¶ 15. Plaintiffs did not file their complaint until June 3, 2012. D. 1-1 at 5. Accordingly, to the extent Plaintiffs assert a claim under TILA, it is time-barred.

### C. Plaintiffs' Misrepresentation Claims Fail as a Matter of Law

Plaintiffs have also used their c. 93A claim and common law fraudulent misrepresentation claim to assert that Wells Fargo misrepresented the terms of Plaintiffs' loan.

#### 1. Plaintiffs' Fraudulent Misrepresentation Claim Fails as a Matter of Law

To plead a claim for fraudulent misrepresentation under Massachusetts law, a plaintiff must plead that "the defendant made a false representation of material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage." Taylor v. Am. Chemistry Council, 576 F.3d 16, 31 (1st Cir. 2009) (quoting Russell v. Cooley Dickinson Hosp., Inc., 437 Mass. 443, 458 (2002)) (internal quotation marks omitted).

Here, Wells Fargo asserts that even if its representatives misrepresented the terms of Plaintiffs' loan prior to the loan closing, that reliance on these alleged misrepresentations was not reasonable given that C. Downey was provided with copies of Plaintiffs' promissory note, truth-in-lending disclosure, HUD settlement statement and notice of right to cancel at closing and all of these documents contained the operative terms of the loan, to which Plaintiffs agreed. D. 17 at 12-15. The Court agrees. For purposes of a fraudulent misrepresentation claim, "[i]t is unreasonable as a matter of law to rely on prior oral representations that are (as a matter of fact) specifically contradicted by the terms of a written contract." Masingill v. EMC Corp., 449 Mass.

532, 541 (2007). C. Downey had all of the information before her when she signed her loan documents, but chose not to read them. SOF ¶¶ 20-26. "[W]illful blindness is insufficient to support a cognizable claim of reasonable reliance." Bertera Chrysler Plymouth, Inc. v. Chrysler Corp., 992 F. Supp. 64, 74 (D. Mass. 1998). The Court, therefore, concludes that Plaintiffs' fraudulent misrepresentation claim fails as a matter of law.

### 2. *Plaintiffs Have Not Demonstrated Evidence of an Unfair or Deceptive Act or Practice*

Wells Fargo mounts a similar attack on Plaintiffs' c. 93A claim, arguing that where the underlying common law claim fails, its related c. 93A claim must necessarily fail. As an initial matter, Plaintiffs' failure to establish reasonable reliance does not necessarily vitiate the viability of a 93A claim. Hershenow v. Enter. Rent-A-Car Co. Of Boston, Inc., 445 Mass. 790, 800 n.20 (2006) (citation and internal quotation marks omitted) (noting that "reliance . . . is not an essential element of a G.L. c. 93A claim").

In addition, Wells Fargo cites Sonoran Scanners, Inc. v. PerkinElmer, Inc., 590 F. Supp. 2d 196, 212 (D. Mass. 2008), aff'd in part, rev'd in part on other grounds, 585 F.3d 535 (1st Cir. 2009), for the proposition that "[t]o the extent a party's Chapter 93A claims are based only on failed common law or statutory grounds, several courts have refused to find Chapter 93A liability." Id. at 212 (collecting cases). Nevertheless, "the definition of an actionable 'unfair or deceptive act or practice' goes far beyond the scope of the common law action for fraud and deceit" particularly because "in the statutory action proof of actual reliance by the plaintiff on a representation is not required." Slaney v. Westwood Auto, Inc., 366 Mass. 688, 703 (1975). Accordingly, the Court declines to enter summary judgment in Wells Fargo's favor on this ground alone.

The First Circuit has addressed the applicability of c. 93A to a change in contract terms,

14

which is the gravamen of Plaintiffs' allegations here. In <u>Devine & Devine Food Brokers, Inc. v. Wampler Foods., Inc.</u>, 313 F.3d 616 (1st Cir. 2002), the First Circuit found that a company that rewrote a contractual provision in its favor did not violate c. 93A because the company was "up front in expressing this desire. It is not necessarily an unfair trade practice to get the better of the bargain." <u>Id.</u> at 620.

Here, Plaintiffs assert they were told by a representative of Wells Fargo that their total payment including insurance and taxes would be $1,800 per month. D. 21 ¶ 2. The terms of the loan changed. On September 17, 2009, Wells Fargo disclosed that Plaintiffs' initial payments on their adjustable rate mortgage would be between $1,769.11 and $1,784.12 on a total amount financed of $333,553.22. SOF ¶ 8. The same day, Wells Fargo sent the "Good Faith Estimate of Settlement Cost" based upon a total mortgaged amount of $341,649.00 and disclosing a total monthly payment of $2,269.09, including taxes and insurance. <u>Id.</u> ¶ 10. Eventually, Wells Fargo approved Plaintiffs for a loan of $348,957.00 after applying for a $341,649.00 adjustable rate mortgage at a 4.0% initial rate. <u>Id.</u> ¶¶ 14-15.

The documents that Plaintiff signed at closing, which govern the transaction at issue, provided for a $348,957.00 loan, <u>id.</u> ¶ 27, though, as explained above, the truth-in-lending disclosure issued at closing disclosed a total amount financed of $340,822.52 and an initial payment varying between $1,806.95 and $1,822.28. <u>Id.</u> ¶ 31. Ultimately, the terms that Wells Fargo disclosed to Plaintiffs at closing are the ones which Plaintiffs agreed and accepted. <u>Id.</u> ¶¶ 27-35. There is no evidence that Wells Fargo attempted to conceal the true nature of the loan, the terms of which Plaintiffs approved by signing the promissory note, the truth-in-lending disclosure, two copies of the notice of the right to cancel and a HUD-1 settlement statement. <u>Id.</u> Accordingly, there is no genuine dispute of material fact as to whether Wells Fargo did not

engage in unfair or deceptive conduct.

### D. Plaintiffs' State Law Debt Collection Claim Fails as a Matter of Law

Plaintiffs have asserted that Wells Fargo violated Mass. Gen. L. c. 93, § 49, a state statute that prohibits unfair or deceptive debt collection practices. Wells Fargo argues that the definition of "debt" under the operative Massachusetts regulations excluded Plaintiffs' mortgage from the purview of this statute. Prior to March 2, 2012, 940 C.M.R. § 7.03 excluded from the meaning of debt "money which is owing . . . as a result of a loan secured by a first mortgage on real property, or in an amount in excess of $25,000 . . . ." See 2012 MA REG TEXT 254855 (NS) (amending prior regulations). See Pettway v. Harmon Law Offices, P.C., No. 03-cv-10932-RGS, 2005 WL 2365331, at *6 (D. Mass. Sept. 27, 2005); Conrad v. Fed. Home Loan Mortgage Corp., 28 Mass. L. Rptr. 603, 2012 WL 2335271, at *5 (Mass. Super. April 24, 2012). Accordingly, plaintiffs seeking to recover under Mass. Gen. L. c. 93, § 49 for conduct prior to March 2, 2012 cannot do so. There is no dispute that Plaintiffs have identified no allegedly unlawful conduct by Wells Fargo attorneys occurring after March 2, 2012.

Even if Plaintiffs had identified conduct by Wells Fargo that constituted unlawful debt collection activities, it would be barred by c. 93's jurisdictional requirements. Mass. Gen. L. c. 93, § 49 does not contain a private right of action but provides that "[f]ailure to comply with the provisions of this section shall constitute an unfair or deceptive act or practice under [c. 93A]." See Kassner v. Chase Home Finance, LLC, No. 11-10643-RWZ, 2012 WL 260392, at *9 & n.7 (D. Mass. Jan. 27, 2012) (citing Ishaq v. Wachovia Mortg., FSB, No. 09-11422-RGS, 2010 WL 1380386, at *4 (D. Mass. Apr. 2, 2010)).

Further, "[a]t least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent."

Mass. Gen. L. c. 93A, § 9(3). This "statutory notice requirement is not merely a procedural nicety, but, rather, 'a prerequisite to suit.'" Rodi v. S. New Eng. Sch. of Law, 389 F.3d 5, 19 (1st Cir. 2004) (quoting Entrialgo v. Twin City Dodge, Inc., 368 Mass. 812, 813 (1975)). The purpose of the demand letter is "to encourage negotiation and settlement" and to "control ... the amount of damages." McKenna v. Wells Fargo Bank, N.A., 693 F.3d 207, 218 (1st Cir. 2012) (internal quotation marks and citations omitted). For this reason, the letter must notify the defendant of the specific acts or practices that run afoul of the statute. Spring v. Geriatric Auth. of Holyoke, 394 Mass. 274, 287 (1985) (noting that a "demand letter listing the specific deceptive practices claimed as a prerequisite to suit"). The demand letter in this case did not reference debt collection activity. SOF ¶ 39. This further bars Plaintiffs from proceeding to trial on their debt collection claim.[6]

### E. Plaintiffs Have Not Met Their Burden to Defeat Summary Judgment on Their Emotional Distress Claims

Plaintiffs have alleged claims for both intentional and negligent infliction of emotional distress under Massachusetts law. Compl. ¶¶ 52-56. To prevail on a claim for intentional infliction of emotional distress, Plaintiffs must demonstrate:

> (1) that [Wells Fargo] intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency' and 'was utterly intolerable in a civilized community;' (3) that the actions of [Wells Fargo] were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by [Plaintiffs] was 'severe' and of a nature 'that no reasonable man could be expected to endure it.'

Gouin v. Gouin, 249 F. Supp. 2d 62, 73 (D. Mass. 2003) (quoting Agis v. Howard Johnson Co., 371 Mass. 140, 144-45 (1976)) (further citations omitted). "Behavior that is outrageous and extreme involves "a high order of reckless ruthlessness or deliberate malevolence that . . . is

---

[6] Plaintiffs have not argued for the continued viability of this claim in their opposition to the motion for summary judgment, D. 21.

simply intolerable." Conway v. Smerling, 37 Mass. App. Ct. 1, 8 (1994). And indeed, in the context of foreclosure litigation, "courts have recognized that while home foreclosure is a terrible event and likely fraught with unique emotions and angst, foreclosures, even ones that may involve improper conduct, do not readily go beyond all possible bounds of decency." Koufos v. U.S. Bank, N.A., 939 F. Supp. 2d 40, 53 (D. Mass. 2013) (citations, internal quotations and alterations omitted). Accordingly, Wells Fargo's conduct arising out its foreclosure practices is not actionable through this cause of action.

To prevail on a claim for negligent infliction of emotional distress, Plaintiffs must demonstrate: "1) negligence, 2) emotional distress, 3) causation, 4) physical harm manifested by objective symptomatology and 5) that a reasonable person would have suffered emotional distress under the circumstances." Taylor v. Swartwout, 445 F. Supp. 2d 98, 105 (D. Mass. 2006) (citing Conley v. Romeri, 60 Mass. App. Ct. 799, 801 (2004)). Plaintiffs have demonstrated no evidence of objective physical harm. Accordingly, they have not met their burden to prevail on summary judgment here. See Celotex, 477 U.S. at 322 (finding that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case").

**V. Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment, D. 16, is ALLOWED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge